(158 App. Div. 560.)

## SAUL v. BARSE.

(Supreme Court, Appellate Division, Second Department. October 31, 1913.)

1. ACCOUNT (§ 20*)—CONVERSION—DAMAGES.
   Defendant, who was in possession of corporate stock belonging to plaintiff, was authorized by him to sell it and invest the proceeds in the stock of other corporations. Defendant pooled the stock belonging to plaintiff with that belonging to himself and others, and sold it all, and invested the proceeds generally in the stock of the other corporations, keeping no account so that the shares to which plaintiff was entitled could be distinguished from the others. *Held* that, in an accounting, defendant might be charged with the value of plaintiff's stock which he originally sold but not with the highest prices at which any of such stock was sold.

   [Ed. Note.—For other cases, see Account, Cent. Dig. §§ 109–126, 128–131; Dec. Dig. § 20.*]

2. ACCOUNT (§ 16*)—PARTIES—NECESSARY PARTIES.
   In an action for an accounting, where it appeared that defendant, who sold stock belonging to plaintiff, associated other persons with him in reinvesting the proceeds of plaintiff's stock and that of stock owned by himself and others, the persons interested with defendant are not necessary parties plaintiff, being entitled to hold defendant with whom they had dealings.

   [Ed. Note.—For other cases, see Account, Cent. Dig. §§ 74–76; Dec. Dig. § 16.*]

3. COURTS (§ 493*)—STATE AND FEDERAL COURTS—PRIOR ACTION PENDING—EFFECT.
   Where defendant, who sold corporate stock belonging to plaintiff under an agreement to reinvest the proceeds in stocks of another company, associated with himself other persons in the reinvestment, forming a syndicate for the control of the second corporation, the fact that the property of the syndicate was in the custody of the federal courts in a suit to wind up its affairs will not deprive plaintiff of the right to sue for an accounting against defendant; it appearing that plaintiff's stock was so commingled with that of the syndicate it could not be determined what belonged to him, plaintiff thus having the right to hold defendant for the money value of the stock.

   [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1346–1352; Dec. Dig. § 493.*]

4. INTEREST (§ 20*)—ACCOUNTING—FUNDS IN LITIGATION.
   Where defendant, who was authorized to purchase corporate stock for plaintiff out of the proceeds of the sale of other stock, commingled the stock purchased for plaintiff with that of a syndicate so that it could not be distinguished and was thus unable to deliver to plaintiff the stocks purchased for reinvestment until the affairs of the syndicate should be adjudicated, he is chargeable with interest on his purchases for plaintiff from the time of his refusal or failure to deliver.

   [Ed. Note.—For other cases, see Interest, Cent. Dig. § 41; Dec. Dig. § 20.*]

Appeal from Trial Term, Kings County.

Action by George W. Saul against Mills W. Barse. From a judgment for plaintiff, defendant appeals. Modified and affirmed.

Argued before JENKS, P. J., and BURR, THOMAS, CARR, and RICH, JJ.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

David Leventritt, of New York City, for appellant.
Frank P. Ufford, of New York City, for respondent.

THOMAS, J. Plaintiff was entitled to $400,000 (16 per cent.) of the undivided $2,500,000 of the stock of the Michigan Peninsular Car Company and authorized the defendant and his partner Ives, now deceased, who owned the balance of it and had custody of all of it, to convert it into the stock of railway companies, among others the Ohio Southern and Cleveland, Akron & Columbus, which they did, save to the extent of 1,000 shares preferred and 880 shares common, which were delivered to him. In this action the plaintiff asks the defendant to account. This the defendant has been unable to do beyond showing that, as the Peninsular stock was held in custody as an indistinguishable part of the whole stock, a syndicate, composed of himself, Ives, and one Morehead, used it as a common fund for obtaining a controlling interest in the companies named; that by the voting power of such stock they made the plaintiff president thereof, used the stock for the benefit of the undertaking and on occasions for the personal benefit of the plaintiff, and finally at his instance sold the shares of Cleveland, Akron, & Columbus stock for a sum whereof he received one-half the net proceeds, or $138,750. And the defendant urges that he cannot give the definite information because the purchase of the stock in the two companies was a joint adventure by plaintiff and the syndicate, but that upon winding it up the plaintiff would be entitled to his proper proportion, which by reason of the decline of the stocks and the payment of the $138,750 was largely overpaid. If there was a joint venture, the defendant is quite logical in his position, and in any case his misfortune is that he and his partner have so treated the matter. But the court has found that it was not that, and the finding is not disturbed, notwithstanding the intimacy of the parties in regard to the pooling and sale of the Peninsular stock, the acquisition of the controlling interest in the railroads, and the control of the same, and the use of the substitute stock for a variety of purposes to which the plaintiff was in instances privy. Under the date of December 16, 1892, Barse and Ives, in reply to a letter from plaintiff, stated that they held plaintiff's Peninsular stock and that they were converting it into the stocks of several companies named; that the dividends would be credited to the plaintiff as declared; and that "the holdings of the above stocks are to be transferred to you or put in such name as you may designate, when you may deem necessary." But now the plaintiff would have fulfillment of this declaration, and the defendant cannot do more than answer that the Peninsular stock went directly or indirectly into the stock of the two companies purchased at varying prices, and that plaintiff's interest either as to price or quantity or company is indistinguishable from that of the syndicate. And so as to dividends. In this predicament the referee, who was appointed to state the account, charged defendant with the highest average prices at which Peninsular shares aggregating the amounts that plaintiff was entitled to sold. Such manner of ascertaining value in some instances would be just, and whether it is in the present case will be later considered.

[1] But, however it should be computed, the value of the Peninsular stock should be the basis of ascertaining the value of the substitute stocks. The argument leads to that. How much Ohio Southern and how much Cleveland, Akron & Columbus did that value procure for plaintiff? The defendant never bought any specifically for plaintiff; no investment was made for him. No price can be mentioned that is applicable to any stock bought for him. Plaintiff was cast into the adventure and treated as a member of the purchasing syndicate. Barse shows what the syndicate bought and the prices paid by them. Is the stock most cheaply bought the plaintiff's stock? The defendant cannot tell. Was plaintiff's stock purchased at highest prices? That defendant does not know. Was the purchase in the Ohio Southern or in the Cleveland, Akron & Columbus? The defendant does not know that. The defendant is one of the syndicate enlarged from Barse and Ives, who undertook to act for plaintiff, to Barse, Ives, Morehead, and perchance others. What, then, is fairer than that the defendant should be charged with the value of what he took to convert into other stocks and to hold for plaintiff, but which he duly converted and used for a syndicate whereof he regarded plaintiff a member? This was a misadventure for plaintiff's property caused by defendant's breach of duty whereby plaintiff's interest cannot be discriminated, so the value of the thing committed to him becomes for the purposes of measurement the value of the thing into which it should have been converted. The substitute stocks have declined. Theoretically the plaintiff should bear the loss. This would be so if it could be shown when the conversion of one to the other was made for the plaintiff and into what it was made. But there is no such knowledge. From the sums charged to the defendant the referee has deducted the sum of $138,750, the amount paid the plaintiff, leaving a balance of $91,609.65, to which $76,188.68 interest has been added. The defendant urges that the payment credited on account was in full settlement of the plaintiff's claims. It could have been indifferently found that it was or was not. The referee found that it was not, and there seems to be no reason for distinguishing the defendant's version of the event as the more probable. The plaintiff arranged with the purchaser of the stock from the parties hereto to let him share the purchase and later sold his interest so obtained for $300,000. The defendant would share the profit of it. The plaintiff stood in no confidential relation to the defendant. He bought into the purchase, which he and defendant made, and later sold again, at a profit. The defendant was paying him a half of the purchase money on his debt, and, to free the stock from technical title to some of it in Saul, he joined in the sale. It does, indeed, seem strange that the plaintiff was related so intimately to the members of the syndicate and their transactions and yet was unconscious that his Peninsular stock was a part of the general holdings. Such complacency under the circumstances is incredible. Nor can I believe that it was so. But the question is whether he knew that Barse and Ives had so confused his holdings with the general fund that they could not be extricated and given identity and whether he ratified such condition. There the

defendant and Ives failed in their duty to him and in such respect Saul may complain, for, when he asks to know what he had and when and at what cost it was obtained, he receives only the reply that he was made a party to a joint adventure and that his interest never has been and cannot be particularized.

[2, 3] There is no suggestion that Saul was a member of the syndicate but rather that he and the syndicate were in a joint venture, and that plaintiff must abide by the disposition of the property by the federal court in Morehead v. Striker, a suit to liquidate the affairs of the syndicate. So it is urged that the firm in which Morehead was a partner did whatever was done, and that Morehead should be a party to this action, and that in any case this court has no jurisdiction as the partnership and its assets were involved in the other action. But the federal court properly refused to stay this action on such grounds. Barse and Ives owed plaintiff a duty; they took his Peninsular stock. The plaintiff is asking what they did in furtherance of their undertaking to him. If they included Morehead in the syndicate, they did not thereby relate him to the joint undertaking of Barse and Ives to convert plaintiff's Peninsular stock into that of other companies. Plaintiff looks to the men who made the engagement with him, and it matters not that they, in co-operation with others, converted the securities into substitute stocks and thereby confused plaintiff's holdings. The plaintiff is not asking for any stocks belonging to a partnership in which Morehead was interested. Initially he is asking Barse what he and Ives did with his Peninsular stock. Barse answers that they were converted into other stocks by authority of the agreement. Plaintiff then asks when and how they did it and at what prices. Barse answers that he cannot tell, as he and Ives massed them in the business of a partnership to which he belonged. This court then adjudged that Barse must pay personally a sum equal to the value of the stock received, less credits. There is no interference with the Morehead suit or any property involved in it. If the stock that was bought with the avails of Saul's Peninsular stock was in fact within the custody of the federal court, then it was there by defendant's wrongdoing, and the plaintiff is not obliged to follow it, and if he should it could not be identified.

[4] The referee has charged defendant with dividends on the Peninsular stock. The latest date of sales of Michigan Peninsular stock for which the referee charges defendant was on March 1, 1893. If the stock is to be deemed sold, then it later drew no dividends in defendant's hands. But $14,160 of the $16,560 dividends charged accrued on March 1st or later, so that sum should in any case be deducted from the judgment. Should interest be given? Barse held the Peninsular stock for conversion into other stocks and not for investment in dividend paying stocks. Plaintiff knew that neither Ohio Southern or Cleveland Akron & Columbus could pay dividends. He had the stocks bought in part at times in his name, and some of them were transferred to him and some pledged as a collateral for a personal loan to him. If Barse and Ives had strictly followed the letter of December 16th, no dividends would have accrued to him,

and it is probable that the plaintiff would have suffered considerable loss and would have been largely overpaid by the $138,750. But when plaintiff demanded his stocks on December 28, 1894, defendant should have been prepared to account and deliver them to him, and then plaintiff would have had the benefit of their value. This action was begun on that date, and on January 3, 1895, plaintiff by his attorney made another demand. Among other things, the answer is that, "until the affairs of said syndicate have been definitely wound up, it will be impossible to determine to what securities, if any, the defendant is entitled under the instrument" of December 16th. So the defendant had so conducted the undertaking that he could render no account, and it is proper that he should pay interest on the value of the substitute securities, which is presumably that of the Peninsular shares ascertained from the selling price. But thus far it has been assumed that the value ascribed to Peninsular stock by the referee is correct. I consider that it is not so. The court found that the plaintiff consented, as he did, that the Michigan Peninsular stock should be placed in a general pool of all the stock. That agreement was dated January 7, 1893, and continued to July 7, 1893, and on July 8, 1893, plaintiff received 1,000 preferred shares, and on December 8, 1894, 880 common shares, leaving 1,200 shares of preferred stock and 920 shares of common stock. The referee has fixed the value of plaintiff's stock not delivered at the highest average price at which similar amounts sold between January and March, 1893, which was during the existence of the pool. I regard this preference for plaintiff as an undeserved benefit. At that time plaintiff's interest was a part of the general holding, which, as regards the syndicate interest, was 55 per cent. preferred (2,200 shares) and 45 per cent. common (1,800 shares), and he must have known that the stock was so held in solido. There was no tortious conversion by Barse and his associates of this stock while in pool or at any other time. The pool was not peculiarly to sell plaintiff's stock but to keep all the stock and make sales through a common agency so that prices would be maintained. The sales were manifestly for the benefit of all participants who were entitled to share with equal advantage. Hence it is quite unjust, as it is not the fact, to assume that, as plaintiff's stocks were not segregated while the pool lasted, they must be deemed to have been sold meantime, and that, too, at highest average price for lots aggregating the number of shares in question. Plaintiff's interest was a part of the whole acquisition of Peninsular stock, and it was left to be sold by Barse and Ives at prices and at times by them deemed proper and to be employed in obtaining the new stocks. It was such part when the agreement was made. It so remained during the pool; that is, to July 7, 1893. Except as delivered, it was left to share the fortune of the other stocks. The fact was, and plaintiff must have known it, that his stock was kept in association with that of Ives and Barse; that it was to be sold indistinguishably from the whole and to be a part of the new stock obtained by them. It does not follow from this that the defendant and Ives should not have kept account of the substitute stocks purchased for plaintiff. If, now, the sales of the Peninsular stock be inspected, it appears that they began in

August, 1892, and ended January 2, 1894, and the average price as found for both common and preferred (and their value was approximately the same) was $81 per share.  The defendant is not a wrongdoer for selling the stock but sold with authority, and the plaintiff should have the benefit of the whole sale and nothing more.  The average price is the fair price for plaintiff's stock.  Hence the account would be:

| | |
|---|---:|
| 2,120 shares at $81 | $171,720 |
| In such computation the dividends received in 1893 should be allowed | 16,560 |
| | $188,280 |
| Cr. sale of Cleveland, Akron & Columbus | 138,750 |
| | $ 49,530 |

—to which should be added interest from December 28, 1894, to the date of the report, and the judgment as so modified should be affirmed, without costs.  The other points suggested by defendant do not require discussion.  All concur.